**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                               :
WALTER C. HECK,                :
                               :    CIVIL ACTION NO. 07-4915 (MLC)
        Plaintiff,             :
                               :    MEMORANDUM OPINION
        v.                     :
                               :
AMERICAN MULTI-CINEMA, INC.,   :
                               :
        Defendant.             :
_____:
```

**COOPER, District Judge**

Plaintiff <u>pro se</u> – Walter C. Heck ("plaintiff") – commenced this action alleging an Age Discrimination in Employment Act ("ADEA") claim against defendant – American Multi-Cinema, Inc. ("AMC").  (Dkt. entry no. 1.)[1]  AMC moves for summary judgment in its favor pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry no. 24.)  Plaintiff opposes the motion.  (Dkt. entry no. 27.)  The Court will decide the motion without oral argument and on the papers pursuant to Rule 78(b).  The Court, for the reasons stated herein, will grant the motion.

---

[1]  AMC, in 2006, merged with Loews Cineplex Entertainment Corporation, the parent company of Loews Cineplex Theatres ("Loews"), which employed plaintiff until August 2005.  (Dkt. entry no. 24, Def. Stmt. of Facts ¶ 5-6; <u>see</u> dkt. entry no. 24, Romero Decl., Ex. D, Miller Decl.)  AMC's corporate headquarters became the corporate headquarters for the merged entity, and thus AMC is the named defendant.  (Def. Stmt. of Facts ¶ 6.)

**BACKGROUND**

I.   **Plaintiff's Employment with Loews**

Plaintiff, born on December 31, 1956, began as an "at-will" employee for Loews in December 1989, at the age of 33.  (Dkt. entry no. 27, Heck Decl., Ex. 5, 5-25-06 EEOC Letter at 1; Def. Stmt. of Facts ¶ 3-4; see Romero Decl., Ex. B.)  Plaintiff, in September 1990, was promoted to Manager of Operations at a theatre in Toms River, New Jersey.  (Def. Stmt. of Facts ¶ 7.)  At the age of 40, in August 1996, plaintiff was promoted to Managing Director of the Freehold, New Jersey Loews Metroplex. (Id. ¶ 8-10; Romero Decl., Ex. A, 9-5-08 Heck Dep. at 86.)

As the Managing Director in Freehold, plaintiff was responsible for, inter alia, managing the theatre's overall operations, administration, profits and losses, hiring and training of employees, maintenance, film presentation, facilities, and premises.  (Def. Stmt. of Facts ¶ 18-19; Romero Decl., Ex. A, Heck Dep. at 128-40.)  Plaintiff's staff included the service staff, floor supervisors, movie projectionists, and approximately four to six subordinate managers.  (Def. Stmt. of Facts ¶ 11-12.)

Plaintiff reported to a Regional Director, charged with ensuring that approximately 12 theatres "were in good shape, ran smoothly, and performed well."  (Id. ¶ 13.)  The Regional Directors for the Freehold Metroplex during plaintiff's tenure

2

included Chris Bond, who is younger than plaintiff, and Roger Smith, who is "slightly older" than plaintiff.  (Id. ¶ 13-14.)[2] The Regional Director reported to the East Coast Regional Vice President of Operations, who, overseeing approximately 75 theatres, reported to a Senior Vice President or President of Operations, who in turn reported to the CEO of the company.  (Id. ¶ 15.)  The East Coast Regional Vice President of Operations during plaintiff's tenure included Brian Blatchley and Paul Wehrle, both "about the same age" as plaintiff.  (Id. ¶ 16.)[3]

## II.  Loews' Evaluations Processes

Loews monitored its theatres and the performance of its managing employees through various methods.  One method utilized was a "mystery shopper" program, in which anonymous customers visited, scored, and reported back to the company their experiences at a particular theatre.  (Id. ¶ 21-22.)  Unannounced audits were also performed to observe the financial administration and performance of the theatres.  (Id. ¶ 24.)  The auditors noted issues with compliance of established procedures and policies.  (Id.)  Loews established scoring standards for both the mystery shopper program and the unannounced audits, mandating a minimum score of 85 for both.  (Id. ¶ 23, 24.)

---

[2]  Smith's date of birth is April 21, 1957.  (Romero Decl., Ex. D, Miller Decl. at 2.)

[3]  Blatchley's date of birth is September 15, 1960.  (Romero Decl., Ex. D, Miller Decl. at 2.)  Wehrle's date of birth is September 29, 1967.  (Id.)

Loews, in addition, annually evaluated the performance of its managing employees.  (Id. ¶ 25.)  Managing Directors, such as plaintiff, were evaluated overall, as well as on specific performance areas, which included: (1) Guest Service; (2) Leadership; (3) Cost Management; (4) Facilities Management; (5) Communication; (6) Decision Making; (7) Planning and Organizing; (8) Delegating; (9) Employee Relations; and (10) Training and Development.  (Id.; see Romero Decl., Ex. E at 1.)  The Managing Directors received a score of "1" to "4" for each category, as well as for specific subcategories in each area.  (Def. Stmt. of Facts ¶ 25.)  "1" was defined as "Unsatisfactory. Does not meet expectations or position requirements. Immediate improvement required."  (Id. ¶ 25 n.10)  "2" was defined as "Needs improvement. Meets position requirements most of the time. Some improvement needed."  (Id.)  "3" was defined as "Meets expectations and position requirements."  (Id.)  "4" was defined as "Outstanding.  Regularly exceeds expectations and position requirements."  (Id.)

**III. Plaintiff's Performance**

Various instances between June 2004 and August 2005 have been documented in which plaintiff was notified that his job performance, as well as specific operations at the Freehold theatre he managed, needed improvement.  (See infra III.A-III.G.)

4

**A.    June 2004 Letter**

Plaintiff received a letter from Regional Director Smith, dated June 4, 2004, noting "[plaintiff's] staff needs more training and the [projection] booth needs more housekeeping." (Romero Decl., Ex. F, 6-4-04 Letter.)  Smith noted it is not a staff member's job to "maintain the daily M&R and housekeeping of [plaintiff's] booth," and warned plaintiff not to take "a hands off approach to booth operation."  (Id.)

**B.    September 2004 Performance Evaluation**

Plaintiff was evaluated for his annual "Theatre Management Performance Evaluation" in September of 2004.  (Romero Decl., Ex. E.)  Plaintiff received an overall score of "2" on the evaluation.  (Id. at 10.)  On the evaluation form, Smith noted:

> With the experience that [plaintiff] has I expect a much better run operation.  [Plaintiff] needs to make the decision to pick up the pace and do the job or decide what his path should be.  I can not accept one of this regions [sic] key locations to run below standards.  [Plaintiff] is working at a just get by approach and it is resulting in an under performing operation.
>
> At this point, [plaintiff] is performing his position below standards.  No adjustment in salary is merited. Another review will be done after 3 months (90 days) which expected job performance will improve or result in further disciplinary action.

(Id.)

In the specific category evaluations, plaintiff received a "1" in one category, "2" in six categories, and "3" in three categories.  Plaintiff received the lowest score of "1" in the

"Guest Service" category.  (<u>Id.</u> at 1-2 ("[Plaintiff] is not providing the leadership to his team and staff needed in making guest service a top priority.  I get the highest number of guest complaints related to poor service from Freehold.  [Plaintiff] must step up and take the needed action to improve this area.").) In the "Guest Service" subcategories, plaintiff received three "1" scores and two "2" scores.  (<u>Id.</u> at 1.)  The Freehold theatre received a mystery shopper score of 75.9, below the standard required score of 85.  (<u>Id.</u>)

In the "Leadership" category, plaintiff received a "2." (<u>Id.</u> at 3 ("Currently this location is below standards in guest service, labor controls and auditing procedures.  This is a direct result of lack of leadership by [plaintiff].  [Plaintiff] is not motivated and is not displaying the initiative needed.  He is taking a just get by approach.").)  In the subcategories, plaintiff received two "2" scores and two "3" scores.  (<u>Id.</u>)

In the "Cost Management" category, plaintiff received a "2." (<u>Id.</u> at 3-4 ("Freehold is below standards in most financial areas.  Currently the theatre has been testing a new POS system which resulted in unstable inventory controls, however, this system is not the cause of the other below standard areas. [Plaintiff]'s lack of leadership is showing in all areas.").) Plaintiff was given a "2" in each of the "Cost Management" subcategories.  (<u>Id.</u> at 3)

6

Plaintiff received another "2" in the "Facility Management" category.  (Id. at 5 ("Much more attention is needed in concession operations.  [Plaintiff] has not followed through on requested concession training, which is another sign of poor leadership.").)  Plaintiff received two "2" scores and one "3" score in the subcategories. (Id.)

In the "Communication" category, plaintiff also received a "2."  (Id. ("[Plaintiff] is failing in getting the importance of addressing below standard areas to his team and staff. [Plaintiff] procrastinates too much.").)  He received a "2" in three subcategories and a "3" in two subcategories.  (Id.)

Plaintiff received a "3" in the "Decision Making" category. (Id. at 6 ("[Plaintiff] has many years of experience, however, he isn't putting the experience to work.  He is displaying poor judgment in GEI which has resulted in a poorly run operation.") Plaintiff received one "2" score and three "3" scores in the subcategories.  (Id.)

In the "Planning and Organizing" category, plaintiff was given a "2."  (Id. ("[Plaintiff] is not setting the objectives for key areas of his operation.  This has resulted in below standard productivity levels by his team.  [Plaintiff] needs to set a plan with his team that will address the needed poor areas of the operation.").)  Plaintiff received scores of "2" in three subcategories and a score of "3" in another subcategory.  (Id.)

7

Plaintiff received a "3" in the "Delegating" category.  (Id. at 7 ("[Plaintiff] must set objectives that will result in higher performance levels by his team.  He has to develop better plans for his team that will result in correcting the weakness in key operation areas.").)  He received two "2" scores and one "3" score in the subcategories.  (Id.)

Plaintiff received a "3" in the "Employee Relations" category.  (Id. ("[Plaintiff] needs to get away from just getting by.  This effects the efforts of his team and staff.  [Plaintiff] is liked by all, however, at times, [plaintiff] must remember he is the boss and sometimes that calls for stronger action with his team.").)  He received two "2" scores and one "3" score in the subcategories.  (Id.)

Plaintiff received a "2" in the "Training and Development" category.  (Id. at 8 ("On going poor performance and below standard operation is a direct result from lack of training.").)  Plaintiff received scores of "2" in three subcategories, and received a score of "3" in another subcategory.  (Id.)

Because of his sub-par ratings from the evaluation, plaintiff did not receive a merit-based salary increase in September 2004.  (Romero Decl., Ex. G, 9-24-04 Payroll & Status Authorization ("[Plaintiff] needs improvement.  No increase at this time.  He will be reviewed again in 90 days.").)  Plaintiff was given a chance to improve his performance, and, accordingly,

was scheduled for a follow-up review in three months. (Id.;
Romero Decl., Ex. A, Heck Dep. at 197 ("The decision was to give
[plaintiff] three months to improve [his] performance or there
would be no merit-based raise.").)  Plaintiff's evaluation form,
in addition, noted three objectives: to, in three months, bring
(1) "guest service to company standards, min [mystery shopper]
score] of 85;" (2) "labor under control, budget;" and (3) "audit
procedures to company standard, min of 85."  (Romero Decl., Ex. E
at 8-9.)

### C.   January 2005 Evaluation

     Plaintiff was reevaluated in January 2005, in which his
overall rating was raised to "3."  (Romero Decl., Ex. H at 10.)
The evaluation this time stated:

>     [Plaintiff] has improved his operation since Sept. by
>     increasing M[ystery] Shoppers score by 5, however, it
>     is still below company standards.  Improvement is also
>     noted in audit procedures.  Operations improvements are
>     happening however, these improvements are at too slow a
>     pace.  [Plaintiff] must continue to push his team on
>     making these improvements faster.
>
>     I expect more out of [Plaintiff] and will expect this
>     year to see much more improvements.

(Id.)  Plaintiff received scores of "3" in six of the ten
categories and scores of "2" in the remaining four categories.
(See id.)

     Plaintiff's score in the "Guest Service" category increased
from "1" to "2."  (Id. at 1-2 ("[Plaintiff] needs to continue to
make this area a priority.").)  Plaintiff's "mystery shopper"

9

average increased from 75.9 to 83.38, and his scores in all of the "Guest Service" subcategories were raised by at least one. (Id. at 1.)

Plaintiff's score in the "Leadership" category remained a "2." (Id. at 3 [Plaintiff] has shown more enthusiasm improving the operation.  He must continue to develop his team and get them into a sense of ownership.").)  Plaintiff's scores in the "Leadership" subcategories remained the same as in September 2004. (Id.)

Plaintiff's score in the "Cost Management" category increased to "3."  (Id. at 3-4 ("Some improvement noted with recent (12/8/04) audit at 85.  More controls are in for labor. Needs to continue to improve per cap.").)  Plaintiff's scores in three of the subcategories increased from "2" to "3," while one subcategory score remained at "2." (Id. at 3.)

Plaintiff's score in the "Facility Management" category increased from "2" to "3."  (Id. at 5 ("Improvement is noted in housekeeping.  More attention is needed in training staff in concession operations.").)  Plaintiff's scores increased from "2" to "3" in two subcategories, while one remained at "3."  (Id.)

In the "Communication" category, plaintiff's score also increased from "2" to "3."  (Id. ("[Plaintiff] has shown some improvement in this area.  Procrastination is still an issue.").) Plaintiff's scores in two subcategories increased to "3," while two remained at scores of both "2" and "3."  (Id.)

10

Plaintiff's score remained a "3" in the "Decision Making" category.  (Id. at 6 ("[Plaintiff] needs [to] continue to develop his team using GEI and ensure they understand it.").)  Plaintiff's scores for one subcategory increased to "3" and three subcategories remained at "3." (Id.)

In the "Planning and Organizing" category, plaintiff's score remained at "2."  (Id. ("Some improvement has been noted however, more attention is need [sic] to obtain higher productivity levels by all team and staff").)  Plaintiff's scores for the subcategories in this area did not change.  (Id.)

Plaintiff's score for the "Delegating" category remained at "3."  (Id. at 7 ("The overall performance standards are up, however, [plaintiff] needs to push his team to a faster pace in getting these standards higher.").)  Plaintiff's score for one subcategory increased from "2" to "3," while one remained at "2" and two remained at "3."  (Id.)

Plaintiff's score for the "Employee Relations" category remained at "3."  (Id. ("[Plaintiff] has made some team member changes which has an effect on the overall teamwork and understand [sic] of what needs to be done.").)  Plaintiff's score for one subcategory improved from "2" to "3," while one remained at "2" and one remained at "3." (Id.)

Plaintiff's score for the "Training and Development" category remained at "2."  (Id. at 8 ("[Plaintiff] needs to

11

continue to develop his team and increase productivity levels.
He needs to ensure that his staff is following our service
programs and that providing good guest service is needed.").)
Plaintiff's scores in the subcategories remained the same as in
September 2004.  (Id.)

Plaintiff was given a 4.5 percent merit-based salary
increase following the January 2005 evaluation.  (Def. Stmt. of
Facts ¶ 48; Romero Decl., Ex. I, 1-20-05 Payroll & Status
Authorization.)  Plaintiff was also given a $100 cash award for
"having the theatre in the shape that it was in at that point."
(Dkt. entry no. 27, Pl. Br. at 9; Romero Decl., Ex. A, Heck Dep.
at 232.)

**D.  May 2005 AMC-Loews Merger Walk-Through Visits**

Plaintiff learned of the potential merger between AMC and
Loews in the Spring of 2005.  (Def. Stmt. of Facts ¶ 49.)  Smith
informed plaintiff that Loews' CEO would conduct a "walk-through"
visit of all theatres in preparation for visits by the merger
committee.  (Id. ¶ 49-50.)  To prepare, Smith conducted a walk-
through of the Freehold Metroplex on or about May 20, 2005, and
found, inter alia, that the concession, lobbies, and front
exterior areas required attention.  (Id. ¶ 51.)  Smith instructed
plaintiff to resolve the issues.  (Id.)

Ten days later, on May 30, 2005, East Coast Regional Vice
President Wehrle, Smith, and the Director of Concessions visited

12

the Freehold Metroplex to further prepare for the walk-through visits.  (<u>Id.</u> ¶ 52.)  Plaintiff was instructed to accompany the group with a notepad to document any issues to be resolved. (<u>Id.</u>)  Wehrle identified approximately 56 problem areas.  (<u>Id.</u> ¶ 53.)  After the walk-through's conclusion, plaintiff created and electronically mailed Wehrle and Smith an action item spreadsheet, stating "the entire list should either be resolved or nearing resolution within a two to three week timeframe." (Romero Decl., Ex. J.)  The spreadsheet included, <u>inter alia</u>: (1) cleaning, stripping, and waxing certain floors; (2) organizing specific rooms and counters; (3) repairing lights; (4) painting certain areas; and (5) removing graffiti.  (<u>Id.</u>)

Wehrle, in response to problems he identified on the walk-through visit, allegedly mailed a letter addressed to plaintiff at the Freehold Metroplex on May 31, 2005, noting his dissatisfaction with plaintiff's performance.  (Romero Decl., Ex. K, 5-31-05 Letter.)  Wehrle's letter provided:

> My recent walk through of your theatre was very
> disturbing.  The neglect and general lack of even basic
> house keeping was some of the worst I have ever seen.
> From the soiled to stained entry to the filthy storage
> rooms, the operation is simply shameful.  Frankly, I
> expect far better, especially from a manager of your
> tenure.  The dead rodent in your storage room is
> further indication that management lacks pride and
> enthusiasm.
>
> Please understand I will not allow the current
> condition to remain.  I am allowing you 30 days to
> correct the problem.  By copy of this letter, Roger
> Smith is instructed to remove you from the theatre if

the operation is not to standard within 30 days, or if it falls to this level of degradation going forward. To be clear, your removal will involve transfer or termination.

(<u>Id.</u>)

Although plaintiff acknowledges the problems identified by Wehrle "absolutely" had to be addressed, plaintiff contends he did not receive Wehrle's letter.  (Romero Decl., Ex. A, Heck Dep. at 250, 255-57.)

**E.   June 2005 Audit**

Loews performed an unannounced audit on the Freehold Metroplex on June 23, 2005.  (Romero Decl., Ex. L, 6-23-05 Audit Summary.)  The theatre received an audit score of 80, below the required standard score of 85.  (<u>Id.</u>)  The June 2005 score, however, was above the Freehold Metroplex's two-year average score of 78, but below the score of 85 for the most recent audit in December 2004.  (<u>Id.</u>)  Plaintiff was a recipient of the score report.  (<u>Id.</u>)

**F.   July 2005 Letter**

Smith sent plaintiff a letter on July 6, 2005, documenting the Freehold Metroplex's ongoing issue with below average mystery shopper scores.  (Romero Decl., Ex. M, 7-6-05 Letter.)  Smith stated in the letter that he could "***no longer tolerate [plaintiff's] lack of attention to [the Guest Service] area***" and that plaintiff was "***not placing the importance of this on [his]***

14

***team and staff.***"  (Id. (emphasis in original).)  The letter
instructed plaintiff "to take the needed steps and action" to
raise the mystery shopper score, and Smith warned he would take
"further disciplinary action" if the score did not improve in
three months time.  (Id.)[4]

### G.    July 2005 AMC-Loews Merger Walk-Through Visit

Smith, on July 26, 2005, notified plaintiff that Wehrle and
Smith would again visit the Freehold Metroplex on July 28, 2005,
in anticipation of the CEO's and merger committee's visits.
(Romero Decl., Ex. A, Heck Dep. at 276-79.)  Plaintiff, aware
that certain issues identified during the May 30, 2005, walk-
through had not yet been resolved, including, inter alia,
painting, repairing walls, and replacing seat covers, was not
present for Wehrle's and Smith's visit.  (Id. at 279-91.)  Wehrle
and Smith identified 19 issues that needed resolution, including
approximately seven issues that were unresolved from the May 30,
2005 walk-through visit.  (Romero Decl., Ex. N, 8-9-05 Letter;
Def. Stmt. of Facts § 70-71.)  The issues identified included,
inter alia:(1) open trash bags found outside exit doors; (2) an
unclean exterior premises; (3) broken theatre seats covered with

_____

[4]  Plaintiff disputes that each individual theatre was
mandated to receive a score of 85.  (Pl. Br. at 1-2.)  Plaintiff
admits, however, that the three-month average of 75.9 at the time
of his September 2004 evaluation was "below company standard."
(Romero Decl., Ex. A, Heck Dep. at 197-98; see also Romero Decl.,
Ex. M.)

plastic bags; (4) dirty rooms; and (5) various problems in the restrooms.  (Def. Stmt. of Facts § 71.)

## IV.  Plaintiff's Termination

Smith, on August 9, 2005, again visited the Freehold Metroplex.  (Id. ¶ 66.)  Smith made "small talk" with plaintiff for approximately thirty minutes before notifying plaintiff that his employment with Loews was terminated.  (Id.; Romero Decl., Ex. A, Heck Dep. at 283-85.)  Plaintiff contends that Smith explained that Wehrle, rather than Smith, made the termination decision, and Smith did not agree with it.  (Romero Decl., Ex. A, Heck Dep. at 284, 317-318; Compl. at 1.)  Plaintiff asserts that "Smith referred to his supervisor as being on a mission, 'you know, he said, you know how it is when [Wehrle] is on one of his missions.'" (Pl. Br. at 13.)  Plaintiff also contends Smith stated "maybe it's – maybe, you know, the fact that [plaintiff] had been around forever, it's good that [plaintiff] ha[s] a chance to start fresh someplace else," as well as "you know, that people from the old school many times don't get a second chance like this to start fresh."  (Romero Decl., Ex. A, Heck Dep. at 322.)  Plaintiff acknowledges that Smith did not refer directly to plaintiff's age when making these comments, and that Smith may have been referring to plaintiff's level of experience.  (Id. at 327-335.)

16

Plaintiff was given a letter documenting the termination, which included a list of the issues identified during the July 28, 2005, walk-through.  (Romero Decl., Ex. N, 8-9-05 Letter.) The letter stated:

> Please find attached a list of M&R items found during a walk-through by Paul Wehrle on Thursday, July 28th.  As you know, back in May Paul did a walk-through of your theatre and found many areas dirty and in need of repair.  He sent you a letter dated May 31, 2005, requesting that you clean these issues up.  You failed to address all these issues and now more problems in your building were encountered, including major safety issues.
>
> [Plaintiff], along with the ongoing facilities issues there are several other management issues that you are not addressing.  Your record on audits over the past year has been below the minimum standard set by the company.  Your guest service record is also below our standard.
>
> Your lack of attention to critical details is unacceptable.  Therefore, effective today, I'm terminating your employment with [Loews].

(Id.)

Plaintiff's position was subsequently filled by a 38 year-old woman. (Def. Stmt. of Facts ¶ 78.)

**V.   Procedural History**

Plaintiff sent a letter to the Equal Employment Opportunity Commission ("EEOC") on May 25, 2006, claiming (1) he "may have been the victim of age discrimination" while employed by Loews, and (2) his "immediate supervisor made several age related references" upon plaintiff's termination.  (Heck Decl., Ex. 5, 5-25-06 EEOC Letter at 1.)  AMC responded to the allegations,

17

denying plaintiff was discriminated against, and stating plaintiff was terminated on the basis of his job performance. (Heck Decl., Ex. 6, 9-9-06 EEOC Letter.)  AMC also denied any age related references were made upon plaintiff's termination.  (Id.) The EEOC investigated the charge and determined it was "unable to conclude that the information obtained establishes violations of the statutes."  (Heck Decl., Ex. 9, 7-12-07 EEOC Dismissal and Notice of Rights.)

Plaintiff filed the complaint, pro se, on October 11, 2007, alleging an ADEA claim for discriminatory discharge.  (See Compl.)  AMC, however, contends that plaintiff's termination was not related to his age, but rather to his repeated poor job performance.  (Dkt. entry no. 24, Def. Br. at 4-6.)

**DISCUSSION**

I.   **Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The summary judgment movant bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant must set out specific facts showing that there is a

18

genuine issue for trial.  Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56© motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.  The Plaintiff's ADEA Claim

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1). Plaintiff alleges he was the victim of discriminatory discharge on the basis of his age.  (See Compl.)  AMC, however, asserts that plaintiff's termination was not based on his age, but rather "due to poor performance and failure to adequately address problems."  (Def. Br. at 4.)

To succeed, the plaintiff ultimately must show that age actually motivated or had a determinative influence on the employer's adverse employment decision.  Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005).  Where the plaintiff, as in here, does not present direct evidence of discrimination, a court will apply a three-step, burden shifting analysis.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); see Embrico

v. U.S. Steel Corp., 404 F.Supp.2d 802, 817-18 (E.D. Pa. 2005),
aff'd, 245 Fed.Appx. 184 (3d Cir. 2007).[5]

The plaintiff must first establish a prima facie case of age
discrimination, which creates an inference that the employer
acted with a discriminatory motive.  Anderson v. Consol. Rail
Corp., 297 F.3d 242, 249-50 (3d Cir. 2002); Embrico, 404
F.Supp.2d at 818.  Plaintiff must demonstrate that he: (1) was a
member of a protected class, i.e., was over forty years old; (2)
was qualified for the position; (3) suffered an adverse
employment action; and (4) was ultimately replaced by a person
sufficiently younger to permit an inference of age
discrimination.  Wooler v. Citizens Bank, 274 Fed.Appx. 177, 180-
81 (3d Cir. 2008); Narin v. Lower Merion Sch. Dist., 206 F.3d
323, 331 (3d Cir. 2000).  If the plaintiff succeeds, then the
burden of production shifts to the defendant to "articulate some
legitimate, nondiscriminatory reason" for the adverse employment
action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  If
the defendant makes such a showing, the plaintiff must then

---

[5]  The Court will rely on case law analyzing claims under
the ADEA, as well as Title VII of the Civil Rights Act of 1964
("Title VII"), 42 U.S.C. § 2000e, et seq., as both statutes "have
been given parallel constructions due to their similarities in
purpose and structure," and thus the standards applicable to
claims brought under Title VII also apply to claims brought under
ADEA.  DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 725 n.5
(3d Cir. 1995) (quotations and citations omitted); Newman v. GHS
Osteopathic, Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir.
1995).

demonstrate by a preponderance of the evidence that the stated nondiscriminatory rationale was a mere pretext for discrimination.  <u>Id.</u>

### A. Plaintiff is able to establish a prima facie case for age discrimination

It is undisputed, for the purposes of this motion, that plaintiff is able to establish a prima facie case for age discrimination under the ADEA:  (1) he was 40 years old or older at the time of his discharge and therefore he is a member of a protected class; <u>see</u> 29 U.S.C. § 631(a); (2) he was qualified for the position of Managing Director of the theatre; <u>see</u> <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d Cir. 1995); (3) he was terminated from his position; and (4) his position was delegated to a younger employee upon his termination.  <u>Cf.</u> <u>Monaco v. Am. Gen. Assurance Co.</u>, 359 F.3d 296, 307 (3d Cir. 2004) (finding employees who were only two and three years younger than plaintiff to be "a differential which does not satisfy the sufficiently younger standard [the Supreme Court] set forth").  Thus, a presumption of discrimination has been created that AMC must rebut.

### B. AMC proffers a legitimate, nondiscriminatory reason for terminating plaintiff

The record demonstrates that Loews had a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  AMC has proffered the nondiscriminatory explanation that

22

plaintiff's employment was terminated because of repeated and uncorrected poor job performance.  (Def. Br. at 4-6.)  The Court thus finds that AMC has produced evidence of a nondiscriminatory reason for plaintiff's termination to rebut the presumption of discrimination that is created by the prima facie case.  See Fuentes, 32 F.3d at 759 (setting forth criteria for establishing legitimate, nondiscriminatory justification); Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 863-64 (3d Cir. 1986) (finding poor performance as a legitimate reason for employee discharge).

   **C.   Plaintiff fails to show the legitimate, nondiscriminatory reason proffered by AMC to terminate his employment was a pretext for discrimination**

    To counter AMC's showing, "the plaintiff must prove not that the illegitimate factor was the sole reason for the decision, but that the illegitimate factor was a determinative factor in the adverse employment decision, that is, that but for the protected characteristic," the plaintiff would not have been terminated. Fuentes, 32 F.3d at 764.  The plaintiff may prevail by showing "pretext," or simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination.  Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 n.5 (3d Cir. 2000).  To survive summary judgment, plaintiff must present sufficient evidence to either: (I) "cast substantial doubt upon" AMC's proffered reasons for plaintiff's termination

"by painting them as weak, implausible, contradictory, or

incoherent;" or (ii) from which a factfinder could

> reasonably conclude that an illegitimate factor more
> likely than not was a motivating or determinative cause
> of the adverse employment decision (e.g., by showing
> that the employer in the past had subjected him to
> unlawful discriminatory treatment, that the employer
> treated other, similarly situated persons not of his
> protected class more favorably, or that the employer
> has discriminated against other members of his
> protected class or other protected categories of
> persons).

Fuentes, 32 F.3d at 765.

### i.   **Fuentes prong one**

Under the first prong of the Fuentes analysis, plaintiff

must present evidence that contradicts the core facts put forward

by AMC as the legitimate reason for its decision.  See Ramanna v.

County of Beaver, No. 05-1738, 2008 U.S. Dist. LEXIS 72049, at

*31 (W.D. Pa. Sept. 11, 2008).  Plaintiff has failed to present

any competent evidence that would lead a reasonable fact-finder

to disbelieve AMC's proffered reason.  See id. at *32 ("Cases

analyzed under this prong usually survive a motion for summary

judgment when the employer's stated reason for termination is so

implausible that a reasonable fact-finder could not believe

it.").  Plaintiff, in his opposition to AMC's motion, offers no

arguments or evidence as to his basis for age discrimination

other than (1) unsupported allegations that there are disputed

material facts, and (2) that AMC, during the EEOC investigation,

denied Smith made certain comments upon plaintiff's termination,

"possibly inferring discrimination," that AMC now admits solely for the purpose of this motion.  (Pl. Br. at 18-20; see Def. Stmt. of Facts at 1, n.1.)

AMC has set forth ample evidence that plaintiff's supervisors were openly dissatisfied with his job performance. Although plaintiff scored a "satisfactory" rating overall on his January 2005 performance evaluation, the review specifically stated that plaintiff had still not met expectations in certain areas and further improvement was necessary.  See Equal Employment Opportunity Comm'n v. MCI Int'l, 829 F.Supp. 1438, 1453 (D.N.J. 1993) (finding no pretext where, inter alia, a "satisfactory" evaluation, performed as a follow up to an "unsatisfactory" evaluation, noted that although improvement occurred, "more improvement [was] needed").

AMC, moreover, has demonstrated various issues, identified in no uncertain terms by plaintiff's superiors, regarding his performance following the January 2005 evaluation, including the: (1) May 30, 2005, walk-through visit, in which over 55 issues were identified; (2) June 23, 2005, audit reflecting below-average scores for plaintiff's theatre; (3) July 6, 2005, letter regarding the continuing problem of below average mystery shopper scores at plaintiff's theatre; and (4) July 28, 2005, walk-through visit, in which new issues, as well as certain issues from the May 30, 2005, walk-through yet to have been resolved by

25

plaintiff, were identified.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."); see also Billet v. Cigna Corp., 940 F.2d 812, 826 (3d Cir. 1991), overruled on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1215 (3d Cir. 1988).[6]

The Court finds that a reasonable fact-finder would not be led to disbelieve AMC's proffered legitimate, nondiscriminatory reason for terminating plaintiff because AMC admits, only for purposes of this motion, certain statements it denied during the EEOC investigation.  (See Pl. Br. at 19-20; Def. Stmt. of Facts

---

[6]  Plaintiff, to the contrary, contends he was given "no written or verbal notification that any inspection(s) made during the calendar year 2005 met with any supervisor's disapproval indicating [his] continued employment was in jeopardy," as required by company policy.  (Compl. at 1.)  Even if plaintiff did not receive Wehrle's May 31, 2005, letter as he contends, plaintiff here fails to consider, inter alia, (1) his January 2005 evaluation review noting more improvement is needed, (2) the June 23, 2005, audit where below average audit scores were again encountered for the Freehold theatre, and (3) the July 2005 letter stating Smith would "no longer tolerate" plaintiff's lack of attention to guest services, and warning Smith would take "further disciplinary action" if the numbers did not improve. (See supra III.F)  Moreover, plaintiff was aware of the expectations placed upon him and other Managing Directors, knew his supervisors "absolutely" believed he needed to improve in certain areas, and knew that employees who failed to meet company standards were subject to termination.  (Romero Decl., Ex. A, Heck Dep. at 143-54, 171, 184-86, 226, 274.)

at 1, n.1.)  Plaintiff alleges Smith's alleged comments were (1) "[t]hat being from 'the old school,' [plaintiff] should view this termination as an opportunity to 'start fresh' somewhere else as 'many people at [plaintiff's] stage in life do not get such an opportunity,'" and (2) "[plaintiff] should have known that Paul Wehrle was looking to get rid of someone 'that has been around forever.'" (Compl. at 1.)  Plaintiff, however, also alleges Smith stated that (1) "[t]he decision to terminate employment was not his decision," (2) "[t]he decision to terminate was that of Paul Wehrle," and (3) he "did not agree with this particular termination decision."  (Id.)  Although comments by a decision-maker can constitute circumstantial evidence of discrimination, see Abrams v. Lightolier, 50 F.3d 1204, 1214 (3d Cir. 1995), these sporadic comments made by Smith, allegedly attenuated from the termination decision, are not enough to survive summary judgment without more than appears on this record.  See Milham v. Cortiva Educ., No. 07-4468, 2008 U.S. App. LEXIS 25790, at *2 (3d Cir. Dec. 12, 2008); Ezold, 983 F.2d at 545.  Viewing the comments in the context plaintiff alleges they were given, no reasonable fact-finder could conclude that the comments were a reference to age discrimination.  See Ramanna, 2008 U.S. Dist. LEXIS 72049, at *37-*38; Burns v. Potter, No. 04-2793, 2007 U.S. Dist. LEXIS 7717, at *22 (W.D. Pa. Feb. 2, 2007); Grossman v. Daily Racing Form, No. 93-620, 1994 U.S. Dist. LEXIS 8123, at *24

(D.N.J. June 10, 1994); <u>Yun v. Runyon</u>, No. 95-17296, 1997 U.S. App. LEXIS 13081, at *3 (9th Cir. June 2, 1997).[7]

We find that plaintiff has not demonstrated by a preponderance of the evidence that AMC's stated nondiscriminatory rationale was a mere pretext for discrimination.  Plaintiff's subjective belief that he was performing satisfactorily does not provide adequate evidence that AMC's legitimate, nondiscriminatory justification is a pretext for discrimination. (Romero Decl., Ex. A, Heck Dep. at 194 ("In general terms, I believe I did a good job.  I also believe in the eyes of my supervisor Roger Smith, I did a generally satisfactory job.").) <u>See</u> <u>Billet</u>, 940 F.2d at 825  ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext."); <u>see also</u> <u>Silver v. Am. Inst. of Certified Pub. Accountants</u>, 212 Fed.Appx. 82, 85 (3d Cir. 2006); <u>Fletcher v. Lucent Techs.</u>, 207 Fed.Appx. 135, 138 (3d Cir. 2006).  Plaintiff does not dispute the chain of events leading up to his termination, nor does he offer any evidence that such events took

---

[7]  Plaintiff's attempt to prove pretext is, in addition, undermined because Wehrle, the alleged decision-maker in the termination decision, was a member of plaintiff's protected class.  <u>See, e.g.,</u> <u>Elwell v. Pa. Power & Light</u>, 47 Fed.Appx. 183, 189 (3d Cir. 2002); <u>Hanes v. Columbia Gas of Pa. Nisource Co.</u>, No. 06-328, 2008 U.S. Dist. LEXIS 62674, at *22 (M.D. Pa. Aug. 15, 2008); <u>Dungee v. N.E. Foods</u>, 940 F.Supp. 682, 688 n.3 (D.N.J. 1996).  Moreover, plaintiff acknowledges that Smith did not refer directly to plaintiff's age when making these comments, and that Smith may have been referring to plaintiff's level of experience. (Romero Decl., Ex. A, Heck Decl. at 329-335.)

place because of his age.  The Court thus holds that plaintiff
cannot meet his burden under the first prong of <u>Fuentes</u>.

### ii.  **<u>Fuentes</u> prong two**

Under the second prong of the <u>Fuentes</u> test, "plaintiff must
point to evidence with sufficient probative force that a fact-
finder could conclude by a preponderance of the evidence that age
was a motivating or determinative factor in the employment
decision." <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 644-45 (3d
Cir. 1998).  A court should consider such factors as whether the
employer has (1) previously discriminated against the plaintiff,
(2) discriminated against other persons within the plaintiff's
protected class or within another protected class, and (3)
treated similarly situated persons not within the protected class
more favorably.  <u>Id.</u>

Even viewing the evidence in the light most favorable to the
plaintiff, we find that plaintiff has failed to adduce sufficient
evidence of previous discrimination against him to suggest that
an invidious discriminatory reason was more likely than not a
motivating or determinative cause of his termination.  Plaintiff
has even acknowledged that age may not have been a motivating
factor in his termination.  (Romero Decl., Ex. A, Heck Dep. at
317.)  Plaintiff has also failed to produce any evidence that AMC
or Loews discriminated against others within plaintiff's
protected class, or any other protected class, to suggest an

29

invidious discriminatory reason was more likely than not the motivating or determinative cause of his termination.  Moreover, plaintiff fails to make the argument that younger employees were treated differently than he was; plaintiff merely mentions his position was filled by a younger employee.[8]

The Court therefore finds there are no genuine issues of material fact existing as to the circumstances surrounding the termination of plaintiff's employment from which a reasonable jury could infer invidious discrimination.  See Hargrave v. County of Atl., 262 F.Supp.2d 393, 410 (D.N.J. 2003) (holding summary judgment should be "granted unless the party opposing the motion provides evidence such that a reasonable jury could return a verdict in favor of the nonmoving party") (citations and quotations omitted).  The evidence cannot support a reasonable inference that plaintiff was terminated because of his age.

---

[8]  As of January 2006, nine Managing Directors for Loews were age 40 or older, and eight Managing Directors were under 40. (Def. Stmt. of Facts ¶ 70.)

**CONCLUSION**

Plaintiff cannot offer sufficient evidence to rebut the legitimate, nondiscriminatory reasons for his termination.  For the reasons discussed <u>supra</u>, the Court will grant summary judgment in favor of AMC.  The Court will issue an appropriate order and judgment.


                                    s/ Mary L. Cooper
                                  **MARY L. COOPER**
                                  United States District Judge

Dated:   March 4, 2009